Please rise. This court is back in session. Please be seated. Good morning again to those who were here and good morning to those who weren't. The clerk will call the next case. 16-010-19 King Koil Licensing Co. v. Harris Counsel, please approach. Introduce yourselves and approximately how much time for argument. Good morning, Your Honor. Dan Albers for the Appointment of an Appellant, King Koil Licensing Co. I have 20 minutes and can I have 5 minutes for rebuttal, please? Okay. Good morning, Your Honor. It's Adam Thott on behalf of the defendants. Roger. I have some boxed evidence. 5-011-Karol. I have 20 minutes for that. Thank you. May it please the court. Counsel, the principal main defendant in this case, Mr. Harris, an attorney, made a mistake. And the mistake is the key factor for the four bases that we're asking the court to reverse and order a new trial. He changed a key element of the licensing agreement between the parties to exclude private label sales. That agreement that had been in place for 20 years, they'd always covered private label sales, and he changed that without his client's knowledge, and he changed that without telling him when he was making that change. He says he sent him a red-lined copy and he expected his client to read it. He did testify to that, but his client testified, my client testified, that in the course of the negotiations, he would get a draft, and his practice was to go, he wouldn't even look at the red line, he would look at the new draft, and he'd look at his notes of the changes that were made, and he didn't look at this because there was no change in effect. Did he ever tell Mr. Harris that? I don't look at your red lines? I believe there was testimony to that effect, that this is how he understood you were going to do it. He said that, but did he ever tell Mr. Harris that? I believe the record is that he told him that was his practice. There are two key points on this. One is there was evidence that at the time the mistake was first raised by the licensee, Mr. Harris immediately told the licensee's counsel and his own client that there had been a mistake made, that he'd made a mistake, that he understood that the agreement did not reflect his intent or the client's intent with respect to what should be in the agreement. So he offered at that time to represent King Coyle for free to try to rectify the mistake based on reformation or rescission, both of which, of course, are based on mistake of fact. That didn't go into evidence. The fact that didn't go into evidence, and there were at least five pieces of evidence tended on this, including three letters from Mr. Harris, and including their own pleading and affirmative defense, which plugged this, and including testimony from our expert, who had testified this demonstrated consciousness of guilt and violation of the standard of care. We were prejudiced. We didn't get evidence before the jury, which would have had an effect. In fact, they themselves have argued, both below and on appeal, that if that evidence had gone in, the result would have been different, which is exactly the standard the court applies to. Well, they argue that it would have been prejudicial to the extent that it was an effort to compromise with an unhappy client, and it was going to be used specifically for the purposes that Rule 408 says it shouldn't be used. That was their argument, and that issue, I think, is reviewed de novo here as to whether it was a settlement offer, and it was not a settlement offer. Why is that not a settlement offer? It's not a settlement offer for two reasons. One, because it specifically says it's not a settlement offer. It says you can accept our offer to work for free, which we're ethically bound to tell you that will not compromise any claim you may have against us. So if they accept it... Well, that doesn't mean it's not a settlement. It depends. They can't, because of the rules of professional conduct, make that suggestion, but they could still try a partial settlement is still a settlement. If they were able to represent them and they were able to be successful, which they thought they would be, then the whole thing would have gone away. But it wouldn't be a settlement, and their claim would still be the extent to the extent there is a claim. But there would be no claim. There would be no claim. If they went ahead and they were successful, which is what they expected to be, there would have been no claim. It's not a settlement offer because if they accepted it, there would not be the end of the dispute. So you're saying that lawyers can never settle a matter with their clients because there are certain ethical rules that have to be followed, and therefore lawyers are in a different position than others. I would not say they can never settle it. I would say if you're ongoing counsel and you're going to make an effort to settle the case, then you have to specifically tell them that you're doing that. You have to get their agreement, and they probably need independent counsel to make that determination. The defendants did none of that. So they said if you accept this, it's not a settlement. You're not releasing your claim in any way. There was also no dispute at that time, so it couldn't have been a settlement offer. The plaintiff had not raised any dispute. In fact, Mr. Roberts specifically testified, I didn't know that there was any issue until they sent me this letter.  They didn't try to assert a claim. In the case we cite, Ray Bestel says it's exactly the basis where the court said it's not a settlement offer. The other issue on this, and I understand the policy rationale that you're raising, Your Honor, but what the defendants are essentially arguing is you should keep this under 408 because if you don't, we won't be encouraging lawyers to try and settle when there's a dispute raised as to whether they met the standard of care with their client. But they had an ethical obligation to raise that issue once they knew there was a dispute. And whether they raised the dispute or not, whether they met their ethical obligation has nothing to do with 408. In other words, they're saying to you, apply 408 so that we can meet our ethical obligation. 408 has nothing to do with that. And then also, they were in the position where they were trying to use, they're not trying to use what they sent to the client to the client's disadvantage, saying, well, see, if you had accepted this, then we would have had an opportunity to try and reduce your liability. Because you didn't, you can't use this under 408. So what would your evidence have been if you were allowed to introduce that? In a nutshell, what would it have been? There were five pieces of evidence. No, no, no, no. On this point, on this point of we offered to represent you for free against It would have been their letters. Their letters, which are exhibits 55. What would it have been, that we offered to represent you in trying to get this resolved? We offered to represent you in a lawsuit against your licensee seeking reformation or rescission for no expense to you. Okay. And that's simply what it would have been. Correct? That's what the letters say. And then they plug that, specifically on affirmative defense, saying because we didn't accept that offer, we didn't mitigate our damages. Okay. So you were precluded from putting that in there. In the best case, you were precluded. And we also had expert testimony that would have said, as an attorney looking at that, that's an initiative consciousness of guilt, and that's further evidence of a violation of the standard of defense. But you already had evidence to that effect. You had an expert saying that there was negligence, professional negligence. You had Mr. Harris saying that he made a mistake, correct? Correct. Okay. So wouldn't this be cumulative? Absolutely not. In fact, they would argue that the reason it shouldn't go in is because this would determine what the jury is going to do in this case. So it's not cumulative. It's specific evidence of an admission, and it's a clear and critical admission. We know that we did something wrong. We know so much that we're willing to represent you for free, which was likely to be a significant amount of legal expense. And law firms just don't do that if they didn't make a mistake. Well, you wouldn't have been able to put in evidence of what it would have cost the defense. Actually, Mr. Rezaian, in his report, did have testimony which was precluded as to what these expenses would have been. That would have been admissible. I'm sorry? You wanted it simply as an admission that he made a mistake and that he was negligent, argued as circumstantial evidence, or an admission that he made a mistake and he didn't perform to the standard of care. Well, yes, that's correct. Okay. So you had that evidence through your testimony that you presented, and you had it through an expert witness who said that there was professional negligence, correct? Correct. Okay. But they argued. So why did the jury find in favor of the defendant? Because they argued that even though the lawyer said there was a mistake, even though the lawyer said it was inadvertent, and even though the lawyer said it didn't reflect the party's intent, that it wasn't really a mistake and it wasn't really inadvertent. It was just inadvertent what the result was. Okay. Now, if the jury had heard the additional evidence had been kept out, they wouldn't have been able to make that argument because he would have no credibility in trying to make that argument because he himself admitted that he was willing to try to change, go back and change the agreement and represent them for free for doing that. But that's one element of your cause of action, correct? Well, by which the standard of care is one. Right. Approximate cause is another. Right. And we don't know why the jury found in favor of the defendant, because it was a general verdict. Correct. Okay. So how can you say that this was reversible here? When you had evidence of negligence, the relationship, and testimony by an expert that there was a breach of the standard of care, you apparently presented evidence to the jury on the issue of approximate cause, and you presumably presented evidence of damages. So the jury had all the elements that found in favor of the defendant, correct, on a general verdict. Correct. So the short answer to that is, Your Honor, because under the applicable standard, which is was the verdict arbitrary, unreasonable, or not based on the evidence that meets all those elements, if you look at the evidence that was submitted, and this case was tried by agreement on pure comparative fault, meaning 0 to 100%. It wasn't if it's greater than 50% you lose. It was 100%. There was no evidence that there was no fault by the lawyer. He himself admitted repeatedly. I think what Judge Pierce is asking, is there other elements, and that is approximate cause. Couldn't the jury have found that the plaintiff did not establish the approximate cause element of its claim? No. And here's why. Because as soon as the jury accepts, which it should have, and apparently it did not, that there was a mistake, then there's approximate cause. Because the evidence was unrebutted that if there's a mistake, it did affect the amount that we were going to be paid under the agreement. Well, couldn't the jury have found that the mistake was on the part of Mr. Roberts, and he didn't review the material the way he should have? He had the opportunities. The jury may have found that. I understand that argument. So how can we... But the jury could not have reasonably found that the lawyer didn't have any responsibility, 0%. And that's what's not reasonable here. If you look at it, if I was going to ask you to read one document in this case, it would be in volume three of the appendix at A551 to 552. And if you look at that... What's the number again? Volume three, A551 to 552. This is the email that Mr. Harris wrote to opposing counsel as soon as he learned of the mistake. And in this email, eight times, he says that it's a mistake. The first one he says, I'm only going to read you two of them, but there's eight in there. This situation was a mistake, and we all know it. We includes him. Neither Dave Roberts nor I was focused on or aware of the stated definition of total annual sales in the license agreement. That definition is incorrect. They try to argue a trial in the face of that, and without us getting complete evidence in with respect to their own admission of guilt, that that really wasn't a mistake, that it was inadvertent, that it really did reflect the client's intent. But then he says on page 552, fourth full paragraph, John, the stated definition of total annual sales was a mistake. There was never, ever any discussion of any notion that less than all sleep products would be subject to royalty. There is no way Bluebell could have thought that exclusion of non-branded products is what we intended, given the history of the parties' communications in getting to the agreement as described above, particularly the fact that there was never any discussion of excluding non-branded sales and the fact that sales to Bob's Ward are included and subject to royalty. In the face of that, the jury could not reasonably conclude that there was no fault and could not reasonably conclude that there was no proximate cause. And how do we know that? Because Bluebell had already agreed to this term in the agreement. Under the term sheet. And Mr. Roberts had instructed Mr. Harris to put those terms in the agreement. Mr. Harris didn't put them in the agreement. He made an inference that had no support. And when he didn't put that in the agreement, he changed the term. He didn't tell his client. So let's talk about the email that Mr. Harris received from Mr. Roberts in which he instructed Mr. Harris to tell Mr. Collison, you should tell them that for all practical considerations, the White Dove Agreement, the Bluebell Agreement, is, capital I-S, the more or less standard form agreement among licensees. But what they left out of it — Wait one second. Sorry. My question is, Mr. Harris says, I did not understand that Mr. Roberts was telling me to lie to Mr. Collison. And the changes you say Mr. Harris made without Mr. Roberts' knowledge, by incorporating the White Dove terms into the Bluebell terms, is a $6 million-plus difference, right? Yes. So I don't see in the license agreements anything that prevents licensees from talking to one another. Is there? Sometimes there are. Well, I don't see anything in this agreement that said to Bluebell, you cannot talk to other licensees about the terms of your license agreement with King Coyle. I don't know if the record establishes whether these are confidential or not. I just can't answer that question. Okay. So I didn't see anything in the Bluebell license agreement. My question is, if Bluebell, during the course of this new license agreement, happens to talk to White Dove and find out that White Dove is not paying royalties on private label sales, and this is a $6 million difference in those agreements, how would you think that would have affected the relationship between Bluebell and King Coyle? I don't think it would affect it at all. And here's why, Your Honor. The evidence shows that the reason that we had private label sales covered with Bluebell was because we had a longstanding relationship and their products included our proprietary information and knowledge. The White Dove was a new licensee. Their products did not, their private label were not going to and did not include our trade secret and proprietary information. That's why there's a distinction between the two, and that's why we're getting paid a royalty with respect to all private label sales, with respect to an existing customer, Bluebell, and this customer, Bob's. And Mr. Harris knew that. And that's why Mr. Roberts said in his instructions to him, and they left out the final two sentences of that memo in their brief, he said, yeah, this is what we're using generally, but every license agreement is different and negotiated differently. And Mr. Harris then said, he inferred that they should change the agreement. That specifically said, no, that's not how we negotiate. And he could have raised the issue with his client and said, this is what I'm doing, and he didn't, and he knew that the client's practice was just to look at what the changes were in the agreement. And he also made a specific change. I'm sorry, Your Honor. Go ahead. He made a specific change in that section later and pointed that out to him, and he didn't agree to that because it reduced the royalty, but he didn't tell him about the other change. Now, what we're talking about is comparative fault. So is there an argument that the jury could have found some fault on the basis of Mr. Roberts' actions? They could have. But could they find no fault on behalf of the attorney who's the genesis of the mistake? And the answer to that is no. And the question with respect to the evidence that didn't go in is, did that have a serious and prejudicial effect such that we believe that that changed the balance in any way? If it did, under the Nelson case, the Supreme Court says that exclusion happened and it could have had a prejudicial effect. If it likely changed on behalf of the party that kept it out, then you order a new trial. There's also other evidence that didn't go in, and this is another one of the four errors. And that's evidence with respect to their actions as our lawyers and they created notes, memos, and they created memos to each other while they were on our counsel and they withheld all of those on the basis of attorney-client privilege. Those are in the record. Well, they didn't withhold all of them. There's like 18 documents. They withheld 17 documents that are in the record. We have not seen them, but the reason we're interested is they're withholding them because they're incriminating. I don't want to do that on camera.  I'm sorry? Could I ask you a question? Take a breath. Thank you, Your Honor. Yes, you may. Trial court reviewed those documents in camera. That's what happens when there's an assertion of privilege and the trial court says, okay, I'll look at them. Trial court said, I believe they're protected under the work product privilege. You asked us to do the same thing, which is basically a de novo review. If we agree with the trial court, what further showing did the defendants need to make? The Supreme Court decision says that merely asserting that it's privileged is not enough. And that's all they did and that's all the record shows. They said they were attorney-client privileged. That's their own client while they're working for that client. So the showing they had to make was, and they didn't make that showing, I went to another lawyer in my firm who is our firm counsel, and I did that under the guise of attorney-client privilege. And I made this request to him and he looked at it as my attorney. And we also advised the client at the same time, we have an issue here and we're going to do this even though you're our client and you may want to seek your own counsel on this. They didn't do that either. So there's no foundation to establish that those were attorney-client privileged. Well, it could have been a work product on the basis of work product. Well, it could have been work product as against their own client because there wasn't a claim. If they're looking at the ramifications of a malpractice suit and considering those, it's work product, even against your own client. I'm not aware of any case law that says that while you are representing a client and you do work on their behalf, which is what they were doing, and they had it on their bills that you can then assert work product privilege as your own client. I'm not aware of any case law that says that, Your Honor. I'm sorry. So it couldn't be. They had to establish a foundation that it was attorney-client privilege and that it was work product, and they established neither. They just asserted it. So are you saying that the moment a dispute arises where the lawyer has a reasonable basis for suspecting that he has a problem with this client and a potential malpractice claim may arise, that at that moment in time, he's got to declare a conflict and get rid of the client? No. So in that case, he's sitting there saying, Oh, man, I might have a problem with this client. I may have a negligence claim against me. I still want to try to help the client resolve this issue that I might be negligent on. He can't write any notes or consult with anybody in his own firm on how to handle this in claim of privilege or work product privilege in those communications? If they're going to do that, then they need to establish the foundation that that's what they did in order to seek that, in order to do that work. They didn't provide that foundation. That foundation would be, I went to my partner and I said, I need your legal advice on what's happening here. They need to say, I'm now going to do legal research client, and it's going to be on my own behalf, not your behalf, and that raises an inherent conflict. Did Mr. Harris make those representations to the trial court for the trial court's in-camera review and reconsideration of whether it was a work product? The judge reviewed all this. Did he not, the trial court? I don't think there, the trial court, I think Judge Barkowitz reviewed it, and then Judge Schneider essentially had a motion to reconsider in front of him, and he relied on Judge Barkowitz's ruling. Okay, so the court reviewed the claim of privilege, correct? Correct. Now, hold that note before you jump in. It's usually the other way around, but it's okay. I get it. We all understand, you know, your advocacy. That's okay, but, you know, we're trying to get an answer to it. So you've now filed an appeal, and you claim that Judge Schneider and Judge Barkowitz were wrong in their review of the privilege asserted and found. Now you're asking us to do the same, as Justice Mason said, that they know will review, which we will do and have done. Yes. So what? There's no foundation in this record. What if we disagree with you? That there's a foundation? That there was a proper declaration by the court that the materials were privileged, were private. My argument has to be, I'm trying to understand your question, but I do want to answer it. I'm sorry if my advocacy is getting in the way of your question. I'm not trying to do that. My understanding is that it's the burden on the party who is asserting privilege to establish a foundation that privilege applies. That the privilege is narrowly construed. That a mere assertion that something is privileged is not enough. That you have to establish a foundation. And that the record here does not establish that foundation. That Mr. Harris, while he said, he considered it attorney-client privilege, did not establish that he had an attorney-client relationship as a client with anyone else when he did these things. He was acting as an attorney on behalf of a client when these things occurred. So it cannot be, back to your point, Justice Mason, it cannot be privileged or work product as your own client. If you want it to be, you have to establish that foundation. And I do believe you have to tell the client that's what I'm doing. But wasn't that actually doing it on behalf of the client in that case being his firm? Because the firm was in the crosshairs. He and the firm were both in the crosshairs. That's correct. Which creates a conflict. Well, so back to my question, he should have declared the conflict and walked away from the client and sent King Coyle to you. He could have said, here's the issue. If you want me to continue to be your counsel, that's fine. But I think you should get an independent counsel to tell you whether you want to do that or not because I have a conflict on this issue. He didn't do that. They continued to do their work. That work, which was done on behalf of King Coyle, is not privileged as to King Coyle. That work done on behalf of King Coyle is not work product as to King Coyle. It could not be. But again, they have separate obligations to themselves that they foresaw. And can't Mr. Harris then speak with others in the firm in order to make determinations as to what the firm should or should not do in this circumstance? And that would be its own work. Not, you know, you're saying it belonged to the client. But in this case, what he's doing is with regard to a firm vis-à-vis itself, I guess, and the client. As I understand the work, it was for whether they could seek rescission or reformation, which was the work they were doing on behalf of the client. If they're also doing it on behalf of themselves, I guess that's fine, but it's not privileged as against their own client. It just couldn't be. And if they want to do that, they have to establish the foundation and they have to demonstrate that they gave the client objective advice so they could determine whether they wanted to continue to be their counsel on that basis. You have to remember that at the time they were recommending that the client to represent the client for free, which didn't go into evidence, to seek rescission or reformation of a contract with their biggest licensee. They're essentially saying, Suey, we made a mistake, yeah, but we're going to rectify that and we're going to do that by suing your licensee. And you asked the question earlier, well, I think the ramification would have been on that with respect to the relationship with the client. It would have been very bad, which is why they didn't follow it, which is why there's also a proximate cause here. That licensee had already agreed to this agreement. They already agreed to this term and he changed it. Even after the fact, even after the agreement was executed and was wrong, they still went back and negotiated a lower amount, indicating they were willing to agree. And we know that there's proximate cause from their own conduct because he said he strongly believed there was a basis for rescission and reformation. On what basis? Mistake. So even Mr. Harris believes that there was a mistake, which would have changed the agreement. So there is proximate cause. There's no reasonable evidence that there was no proximate cause. There's no reasonable evidence that there was no liability. The amount, that would be subject to being divvied up by the jury. But they advocated their responsibility when they said there's no liability. And one way they got there was another error that came up, which is there were special interrogatories that were provided on two elements of damages. Those were not dispositive. Because there were three elements of damages. There was lost royalties, there was marketing expense, and there was attorney's fees. And they gave special interrogatories just one was on whether there was lost royalties of 2.75 percent. The second was on whether there were lost marketing expenses. Neither one of those were dispositive. If you go back, I think this is on the record. You wrote them and submitted them yourself. We objected to any special interrogatory. The judge said, no, I'm going to give a special interrogatory. And we said, okay, in the alternative. So if you didn't think they were dispositive, why didn't you propose a special interrogatory that was? Because the first verdict form and the second verdict form had all elements of damages on them. So why didn't you propose, if you thought they were not dispositive, why didn't you propose a special interrogatory that addressed attorney's fees? Because we didn't need to. It was already on verdict forms A and B. Those elements of damages are in A and B, which is what makes it confusing. If you go back and look at the five verdict forms that went to the jury, A, 55 through 60, there's one for the plaintiff, three elements of damages, one for the defendant, three elements of damages, one for the defendant, and then a special interrogatory on one element of damages, which has approximate cause burden, which is contrary to law. And then they have a second special interrogatory, which only goes to marketing expenses, which has approximate cause element that's contrary to law. So the jury looked at this, and they were confused and said, well, if we don't answer the two, the easiest way out of this is just to find for the defendant, because they didn't need to have got to the cause. So we can't speculate on a general verdict where the jury doesn't answer special interrogatories? I've never seen a case like that. Mr. Albers, let me ask you something. You said this was decided and agreed to be tried on a comparative fault? Pure comparative, yes, Your Honor. Okay. What was the range of comparative fault that the jury could find? Zero to 100. 50-50? Good. What if they found 50-50? If they had found 50-50? Yeah, and they just decided that they're both equally at fault here as far as causation. That means we have 50% of the damages. It's pure comparative. We agreed that if it was more than 50, we'd still get the reduced amount. And what if they found 100% to King-Coyle? 100% liable to King-Coyle? I think that would be against the manifest way of the evidence because there was no evidence that the lawyer did not commit malpractice that did not cause damage to the plaintiff. But they could have found that Mr. Roberts? Yes, sir. That's his name. Was more at fault, 100% at fault. I don't think on this record they could have found that. I think that would be against the evidence. There would be no evidence to support that. Because if you look at what I just read to you, and you look at the documents that should have gone into evidence which are consciences of guilt, no reasonable jury could conclude there's no liability on behalf of the lawyer. We asked you to reverse on four bases. Failure to admit critical evidence, reverse against the manifest way, the withheld documents, and because of improper and prejudicial special interrogatories. Thank you very much. Thank you. May it please the court. Plaintiff's appeal is entirely on this mistake theory. And in raising it, they asked the court to reverse the jury's verdict. But the jury has been noted under the general verdict. And I would address the mistake theory in a little bit. But first I want to address the proximate cause element and the standard of care element. Because even despite the mistake theory, the jury still could have found in Mr. Harris' favor on those elements. First on the proximate cause element, In closing argument, we stated that this was arguably the most important issue in the case. They stated then, pointed out that Bluebell, who was the other party to this contract, no evidence was introduced for Mr. Carlson, Mr. Skelton, anybody in Bluebell, whether a letter, an email, anything to explain whether or not Bluebell would have agreed to the terms that King-Foyle claims they were damaged for not receiving. In fact, in their brief, they point out that in our post-trial motion, we argue that we were allowed to introduce evidence that stated that they would not have agreed to that. It's an exhibit that we try to get in that the trial court did not admit. But merely because we did not get evidence that a conclusively established Bluebell would not have agreed to those terms does not mean that they met the burden of proof on the element that they would have agreed to those terms. So when we argued to the jury that there was no proximate cause, because they had no idea whether or not Bluebell would agree to those terms, and the jury returned a verdict, it would be consistent with that argument. But Clayton hasn't made any argument really on proximate cause being against the manifest way of the evidence. They only state that, you know, that they proved it. And they base it on two things, both of which I think are incorrect. They argue first that the term sheet that was sent from Mark Carlson to Dave Roberts showed that they agreed to those terms. However, that term sheet was created after Roberts and Carlson had met in a diner in Hartford, Connecticut, for five hours going over the October 2008 version of the agreement. Carlson then said the terms to Roberts. Roberts then sent them to Mr. Harris and said plug these into the October 2008 agreement. What's important about that is that the October 2008 agreement stated that marketing budget contributions, which is $5.9 million of the requested $6.4 million damages, was specifically allotted only on King Coyle goods, King Coyle products. It wasn't on all products. So the contract that Roberts and Carlson had gone over exempted private label sales from marketing budget contributions. Now they're trying to argue that that's evidence that they would agree to it. But whether or not Dave Roberts ever agreed to it, Mark Carlson, we can assume, did. And when he created this term sheet stating that we'll do this on marketing budget contributions, he's rigging that all the way to your ass saying it's just on King Coyle products. So there is no evidence that they had agreed to this term based on the term sheet. Well, what about Mr. Alvaro's argument that Lobel had always paid marketing contribution on private label sales? The contract that they were under at the time they negotiated the new contract did have them pay marketing budget contributions on private label sales. However, the new contract was increasing the warranty rate greatly. The original one was 2% on the first $2 million and 1% on everything after. This increased it to 2.75%. On all sales? On all sales. And that increase, we actually had a damage expert that said in the first five years that would be $3.4 million under the new term than it would have been under the original term. And so over the course of the 10-year contract, which was the new one they were negotiating, that would have been an additional $6.4 million. So just because they had paid marketing budget contributions on private label sales before, under this new royalty agreement they're going to be paying over 10 years potentially $6.4 million. And so King Coyle is asking you to then accept, well, they would have just paid an additional $5.9 million on marketing budget contributions, getting it to almost $12 million more in this new agreement. So just because they had in the past is an evidence that they would have agreed to it in the future because that's why they're getting into a new contract. Markets change. Business climates change. You get into new relationships based on what you're expecting that your business is going to grow. And so going into this new contract, they were agreeing to increase on royalties, but that's a good indication that they were going to agree to our marketing budget contributions. So those are the two pieces of evidence that King Coyle asks you to reverse the jury's verdict on the manifest way to the evidence standard. But there's simply nothing, basically even those, that would indicate that Blue Bell had just agreed to the increased numbers. So for the jury to find that there was no proximate cause because they never heard anything from Blue Bell stating that they would have agreed to these increased terms and there's no circumstantial evidence that would conclusively establish they would, there's just no way to find that the jury's verdict, if it was on proximate cause, was unreasonable then it should be reversed on the manifest way to the evidence standard. But isn't Mr. Harrison, I'm part of that cause because you kept saying it's a mistake. Mr. Harris stated that it was a mistake because Dave Roberts had told him a mistake. Mr. Harris's position. So Blue Bell before he told Mr. Roberts. I'm sorry? Didn't Mr. Harris know there was something wrong before he talked to Mr. Roberts? My understanding of when Mr. Harrison understood there was something wrong was he was informed by Blue Bell that they'd be making payments and he told Mr. Roberts and Mr. Roberts says that's not right. At that point he understood that, at least from Robert's position, this is where the briefs sort of go back and forth on what's the definition of a mistake and actually more of the Article A mistake. Mr. Harris conceded for purposes of the trial there was a mistake. He was being sued by King Coyle stating there was a mistake. Whether or not he made the mistake, his understanding of it after he appeased what had happened was when he received the e-mail from Mr. Roberts that you had referenced earlier that said for all intents and purposes it is the same that White does get in, that he then incorporated the terms from White of and sent it to Mr. Roberts in a redlined version. And the redlined version had numerous changes. I mean if you go through it, you just open it up and you see if Mr. Roberts said or even opened it and said, wait, Mr. Harris, why are there all these changes? He could have said, well, I incorporated it into the White Dove terms. I mean this is a term that they think is so material that they sued for malpractice on it and were considering a reformation claim. But Mr. Roberts' direction, he's now claiming that, well, that's not really a practical consideration, that that's something that has nothing to do really with White Dove v. Bluebell. I'll ask you the same question I asked Mr. Alvarez. Did Mr. Roberts ever tell his lawyer, you know, I don't even look at those redlines you send me? I believe the testimony from Mr. Harris was he was not told that. That he never told him I did not read these or that I don't read these. What about from Mr. Roberts? I believe Mr. Roberts said that he did not read those and he thinks he may have told Mr. Harris that. If I'm incorrect on the record, I do apologize. But I believe the testimony was he thinks he may have but it was not conclusive. But he said, yes, I told him specifically I never read these things. But even if he hadn't read these things, I mean, we're looking at October, I'm sorry, April of 2009 when this change is incorporated. We forget that, you know, this isn't executed until November of 2009. And this isn't simply a contract that the lawyer is negotiating with another lawyer. This is a contract that Mr. Roberts is negotiating directly with Mr. Collison and the lawyers are, you know, putting in the terms and negotiating the language between each other after these terms were negotiated. But after the April contract was created with these revisions in question, they then were sent to Bluebell. A few days later, Roberts and Harris went to, like, Lewis, Boston and met with Collison at Skelton going over this agreement. In June, Bluebell sends revisions to the agreement. And it specifically changes the definition of total annual sales in 1.6. Roberts and Harris review that. Roberts rejects the change that they had suggested in 1.6. Roberts then sends letters as him and Collison are negotiating. Actually, in closing, Plankton said that at this point Collison starts to drag his feet, just further evidence that if Collison is dragging his feet with this term that King-Coyle says is so favorable to them, if he's dragging his feet on that, imagine if it had been different. But he's dragging his feet. And so Collison and Roberts start and said they should just walk away and forget it and not have a new arrangement. Then letters writing back and forth where Roberts tells Collison, we've gone over this page by page, line by line. And then at the end, they finally hammer out the agreement, which is then signed and executed. I mean, at any point, assuming, let's say for hypothetical purposes, that Roberts and Harris made a mistake, the standard of care experts said that what more could a lawyer have done? The lawyer went over the contract with the client individually. He sent him red lines that communicated. The client is negotiating directly with the other side going over these. He's rejecting changes that is proposed to the very term that's now in question. How can a lawyer do anything more, perhaps, besides strapping down a client and just reading it to him to find out that there is a term in there that the client disagrees with? How big a private label, or does the record reflect how big a private label sale customer Bob's was for Blue Belt? It was a large, I think 10 million, but I'm not sure. I think they were expanding into Bob's. Bob's was a newer client. I think there was expansion, but I won't admit to being that close. And there's no question that Mr. Roberts sat with Mr. Collison in the diner in Connecticut and that version of the agreement had this provision about Bob's. We're excluding Bob's from private label sales. Right. And the provision doesn't say excludes Bob's, but in that marketing budget contribution language. I'm sorry, yes. It says King Crow sales. Interestingly, actually, Mr. Roberts brought back notes from that meeting, and the notes he changed. It said 1% royalties. He changed it to incorrect 1.5. So, I mean, they obviously went through it, and Robert at least saw the number and realized there was a .5 missing, but two lines down, right underneath it, it says King Coyle products. So, I mean, if they're negotiating that in the diner and he's going through this with the percentage, Collison at least has to sit there and know that it's King Coyle sales. So when he sends the term sheet that says that we'll pay 1.5% on marketing contributions, and keep the term sheet silent on private label sales or King Coyle sales, but when he sends that, Collison obviously knows that they just went over this provision. That doesn't include private label sales. So they can't now say that's evidence that they had agreed to this term all along. I want to briefly address a few of the points on the evidentiary ruins on the letter that had the offer to do free legal services. We believe the judge was certainly correct to determine in its totality of the circumstances that this was an effort to offer a compromise or settle the claim. Well, but it wasn't because Mr. Harris said you can still sue me. I'm not asking you to release your malpractice claim. So how does it constitute a settlement offer? You are correct in what he says, but in the whole totality of the letter, I'm informing you you may have a legal malpractice claim against me, and you should seek a lawyer to determine that, as I'm obviously biased and can't give you advice. Then he says I would be willing to do the reformation of rescission claim. If either of those were successful, there could be no claim on legal malpractice because either there's no contract or the contract has been reformed to the way King Coyle claims it should have been. Well, did the part of the letter that said you may have a legal malpractice case against me, did that go to the jury? It did. So the only part was we'll represent you for free. Correct. And their expert actually used that letter to say no attorney would have sent that letter if they thought the claim would be frivolous or it wasn't based in fact and law. In fact and law. They argued it in closing stating that's evidence of a mistake. Again, going to the mistake theory, this was a theory of the plaintiff. That was the theme of their closing, that Harris made a mistake. He sent a letter telling him he may have a malpractice claim. He said, and I quote, he admitted it again and again. They want to add evidence that I guess would be again and again and again. But that would just be, I think it's just a cumulative that they've already been able to make that argument, and the jury rejected it. So whether or not it was a settlement, I certainly believe it was reasonable, even if it was incorrect to determine it was a settlement. So it wasn't abuse of discretion, but even then if it was, it doesn't affect the outcome of the trial because it really only goes to the mistake argument, which was already made, which still doesn't affect the proximal cause or even standard of care argument. On the affirmative defense, the affirmative defense is just bringing in evidence to state that there was this offer. The offer had already been deemed inadmissible, so you can't bring in the affirmative defense that we had filed to say that we can bring that into the back door. Now, if they use, I think a little unfairly, a statement made by counsel in trial explaining the affirmative defense, that at the time this was filed we weren't thinking of this as a settlement, then that is also an argument made in a motion to eliminate. But I think the point is that when you file the affirmative defense, it's filed with the answer, and at the time you put in all the affirmative defenses you may have. And we had a mitigation defense, failure to mitigate. And we put that in. Then as you get up to trial, you start thinking about, okay, now I have my case, what is admissible evidence? And then you start making arguments about the admissibility. And so the judge said, look, I understand you're saying this is a settlement offer, and I agree with that, but if you're going to have this affirmative defense, then it's coming in, which would be correct. But then it was withdrawn. So when the affirmative defense was withdrawn, it's no longer a judicial admission. It's just an affirmative defense that had been left away, so it wouldn't be proper to bring that in just to bring in the evidence of the letter, which is already deemed admissible. On the special reliance stories, that came, we introduced those because that goes to the box of the cause issue, that going into trial and then after trial we thought was very strong, that there was simply no evidence of what Bluebell would have done. And so we offered our instructions, which would have been dispositive on the royalty claim and would have been dispositive on the marketing budget claim, and those were separate damages. They also had another damage component, which would be attorney's fees. Well, if the jury had an answer no on the box of the cause on both the marketing budget contributions and the royalties, that would have then negated attorney's fees. I think they try to draw a claim on the special auditory argument too broadly, because if it has to dispositive the entire claim, you can almost never have a special auditory because also there's often various competing theories going on. There's different damage elements. I think it has to be dispositive of a particular part, and if the jury found that there was no but-for causation on either marketing budget contributions or royalties and yet the jury somehow still filed for them, then that would test the verdict and show that it was incorrect. Interestingly, on this mistake theory, they could have proposed a special auditory, and it said, you know, something cracked in it to determine if the standard of care decision was based on a finding of the mistake. They didn't, so that's why we have the general verdict, where we have both standard of care and approximate cause that are arguments that can't be reversed, I believe, a manifest way of the evidence. And the final point is to the letters that, I'm sorry, to the e-mails and the documents that were deemed to be privileged by Judge Barkowitz. Justice Pierce said, what happens if you have reviewed it and you find that there is foundation? Then you simply affirm on that ground. If you disagree, the answer would be then you could reverse, but you have to determine whether or not that that impacted, you know, whether that would have had any effect on the trial, and I don't believe it does because it just goes to that mistake theory, which was already raised and rejected by the jury, whether on standard of care or on approximate cause. If the court has no questions, then this was an eight-day trial that was done over the course of two weeks. Lots of testimony, experts at the end. Judge Snyder said it was a very well-run trial. I believe that's true. Juries, we have them, so they make these decisions. They weigh the facts. They weigh the evidence, and the jury was entitled to make the decision they had, and this court should not reverse. So we ask the court to affirm. Thank you. Mr. Albrecht? Thank you very briefly, and thank you for your patience with me. Counsel makes the argument that it would have, if the evidence had gone in of his offer to represent the client for free to sue their own customer, that would have been again, again, and again. But they're the ones that argued vociferously at trial, this shouldn't go in because this is to swear the jury's verdict, so it wouldn't have been another again. It's key evidence. It's different. It's different in kind. The question for the court now is, looking at that, keeping it out, if you believe that it shouldn't have been kept out because it's not a settlement offer, then could it possibly have affected the balance of what the jury was considering, and certainly based on their own arguments, it could have. With respect to proximate cause, their argument about if there was nothing from Bluebell, this issue was addressed below twice by the court. They denied summary judgment on this argument. He also denied a direct advert to this argument, and there's probably 500 pages of evidence with respect to proximate cause that we submitted, starting at the record of 3301 in this issue. So the court believed that there was evidence of proximate cause based on mistake and submitted the issue to the jury on that basis. The argument about the October 2008 discussions is kind of a red herring because the evidence before the court was that later on that changed and there was a term sheet which included Bob's and included all private label sales and included both marketing expense and royalties. So what happened six months before is not really relevant. But you've got an agreement in April 2009 that Mr. Roberts and Mr. Collison reviewed together, side by side, going through the agreement, and in that agreement on marketing contributions, it says, first of all, marketing contributions on King Coil sleep products, not on all sleep products, and then there's that parenthetical that refers to Bob's and says there are going to be no marketing contributions on sales to Bob's. How could Mr. Roberts sit next to Mr. Collison and say, and there's a note in the margin of that particular paragraph where he says, no, it should be 1.5 percent. How could he credibly say, I didn't know that private label sales were excluded? Because he didn't read it and his client didn't tell him, which is going to go back to the other point that he made, which was the standard of care expert who testified, what more could the lawyer do? Very simply, he could say, I changed the agreement that you provided to me and I took this provision out and it's going to cost you $6 million. And he didn't tell him that. And he had no reason to look at that. He was looking at, this is not a lawyer. This is a person who's not an expert with respect to these issues. This isn't legalese. What we're talking about are the business terms of this license agreement. They're the heart of this license agreement. That, to me, was Mr. Roberts' job. And if you go back, and it's a big record, but if you look at these agreements sequentially, it's a lengthy agreement and then it's redlined. What Mr. Roberts did was, once he got the next one, he didn't look at the redline, he'd look at the agreement and go through his notes as to what to change to make sure they were changed. He had no expectation there'd be any other change. And he's not going to go through a 25-page document each time to look for changes, particularly when his lawyer doesn't tell him there's change. He says, there's another change. And he looks at that and he says, no, this isn't acceptable. Why would he then look for other changes? He had no reason to. Four points on that response with respect to the expert. This argument that this created a fact question, this was an evenly played game and therefore you should not reverse, hinges entirely on their expert's testimony, which was not competent evidence with respect to the violation of the standard of care or approximate cause. He testified essentially on four bases, and if you go through their briefs, this is what they argued. First, Mr. Leidy testified there wasn't a mistake. And we moved to eliminate it to keep all this testimony out and we made the objection to this evidence in the same basis of trial. A standard of care expert can't give an opinion on whether there was a mistake. He gives an opinion on whether there was a violation of the standard of care. You haven't raised that issue on appeal. I'm sorry? You haven't raised that issue on appeal. I have not separately raised the issue that it was an error to let him testify, but I have raised the issue that there's no competent evidence to support the jury's verdict, and it's raised within that issue, that this is not competent evidence. So we did object to it. It is preserved on that basis. We've not separately raised the issue. But when you're looking at the evidence. How does that work? It's not competent evidence. But don't you have to raise that on appeal to say that evidence should not have come in and it should have been excluded and, therefore, it can't be considered by the jury? I mean, you're saying I objected to it down below, but it's before you on appeal. I think it's before you on the issue of the manifest right, and it's also before you with respect to what was the impact of keeping out the other evidence with respect to the evidence that was heard. So he testified it was a mistake. He couldn't give an opinion on whether there was a mistake. By the way, he's also contributing. Isn't that a separate issue on appeal, though, that there was no expert testimony, no competent expert testimony on behalf of the defendant? I mean, really. My argument is. I know what your argument is, but I think that argument has to be raised specifically on appeal. It just can't be objected to below and then relied on on appeal as a catch-all. Otherwise, we'd be all over the place trying to figure these issues out. Okay. I understand. That's a concern. Okay. My job as an advocate now is to address your concern, and the best way I can do that is to say my understanding of the review on appeal with respect to manifest right is you look at the competent evidence. This was not competent evidence because that expert should never have been permitted to give this testimony, and we did object to it. But our position is we do not have to separately raise that when we've raised a manifest right of the evidence argument. In any event, he testified that it wasn't a mistake, specifically contrary to what his client testified, that it was a mistake. He testified that Mr. Harris didn't know it was a mistake, and as your Honor pointed out, if you look at A551, when the issue was first raised before he even talked to Mr. Roberts, he knew it was a mistake, and he said we did not intend this, not just him and his client, and it should have been part of the agreement, and it wasn't. He testified that there were substantial communications between Mr. Harris and Mr. Roberts about the drafts and that that somehow demonstrated that his client met the standard of care, but that begs the question because Mr. Roberts specifically told his lawyer to include these terms in the agreement, and he took them out and didn't tell him. And finally, he testified that Mr. Roberts intended the definition that went into the agreement. He couldn't give testimony about what Mr. Roberts intended. That shouldn't have gone before the jury, but it doesn't meet their burden of proof, and it doesn't demonstrate that there's no effect on our manifest right. I guess the final point I would make, and I wasn't sure how to raise this with the Court, so I was trying to think of an appropriate analogy. Of course, you always get in trouble when you make analogies. It's how can you look at this case and apply the appropriate standard of review, and the best example I can give you is when you look at the evidence that didn't go in with respect to his offer and with respect to the information that you're going to look at with respect to criminal client privilege, you're looking at a movie, but you didn't have all the scenes in the movie. So the example I'm going to give you is Ben-Hur, which is my favorite movie. It came out in 1959, the year I was born. If you took The Chariot Race out of Ben-Hur, it wouldn't be the same movie. It wouldn't have the same impact, and it wouldn't have the same meaning. The evidence that's been taken out of this case that wasn't provided changes the outcome of the case and changed what the jury saw in the movie they saw. If The Chariot Race had gone in, if his admission had gone in, they would have found for us. So I'm asking the Court to reverse on the four bases that we've argued. I thank you for your patience with me today. Thank you. In case you've taken under advisement, I want to thank Mr. Albrus and Mr. Barrett. Excellent arguments and briefs, and obviously we have a lot to think about. And we stand adjourned. Thank you.